SAMUEL R. MAIZEL (Bar No. 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (Bar No. 235736)
tania.moyron@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
Telephone:  213 623 9300
Facsimile:   213 623 9924

Proposed Attorneys for the Chapter 11
Debtor and Debtor In Possession

# UNITED STATES BANKRUPTCY COURT
## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re | Case No. 22-02384-11 |
| BORREGO COMMUNITY HEALTH FOUNDATION, | Chapter 11 Case |
| Debtor and Debtor In Possession. | **DECLARATION OF ISAAC LEE, CHIEF RESTRUCTURING OFFICER, IN SUPPORT OF DEBTOR'S EMERGENCY FIRST DAY MOTIONS** |
| | Judge: Honorable Laura S. Taylor |

DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

- 1 -

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

**DECLARATION OF ISAAC LEE**

I, Isaac Lee, hereby state and declare as follows:

1.    I am a Managing Director at Ankura with more than 20 years of operational and financial restructuring experience. I have advised numerous companies on turnaround plan development and evaluation, liquidity improvement initiatives, asset dispositions, liability management and bankruptcy filing preparation. I have also assisted in managing and administering companies during chapter 11 cases. Additionally, I have prior experience with health care providers, including a nine surgical center system and had senior level responsibilities on two prior engagements where Ankura has been involved as Chief Restructuring Officer.

2.    I received my MBA from the Tuck School at Dartmouth College and my BS in Business Administration from the University of Southern California.

3.    On January 2022, Borrego Community Health Foundation (the "Debtor") engaged Ankura Consulting Group ("Ankura") to, among other things, provide financial advisory services.

4.    Effective as of the Petition Date (as defined below), I was appointed the Chief Restructuring Officer ("CRO") in connection with the above-referenced chapter 11 case (the "Case"), and am supported by a team at Ankura.

5.    I am knowledgeable and familiar with the Debtor's day-to-day operations, business and financial affairs, restructuring efforts and the circumstances leading to the commencement of this Case. Except as otherwise indicated herein, this Declaration is based upon my personal knowledge, my review of relevant documents, information provided to me by employees of the Debtor or the Debtor's legal and financial advisors, or my opinion based upon my experience, knowledge, and information concerning the Debtor. If called upon to testify, I would testify competently to the facts set forth in this Declaration.

6.    I make this declaration for the purpose of apprising the Court and parties in interest of general background on the Debtor and its operations, facilities and

patient services, the Debtor's restructuring and transformation efforts to date, the circumstances that compelled the commencement of this Case and additional facts in support of the First Day Motions (as defined below).

7.      To enable the Debtor to minimize the adverse effects of the commencement of this Case on its business, the Debtor has requested various types of relief in a number of applications and motions (each a "First Day Motion," and, collectively, the "First Day Motions"). The First Day Motions seek relief intended to maintain the Debtor's business operations; to preserve value for the Debtor, its stakeholders, and parties in interest; and, most importantly, to protect the health and wellbeing of the patients who are being treated at the facilities operated by the Debtor and the employees of the Debtor. Each First Day Motion is crucial to the Debtor's restructuring efforts and to the health and wellbeing of the patients. Any capitalized term not expressly defined herein shall have the meaning ascribed to that term in the relevant First Day Motion.

8.      Section I of this Declaration provides a general overview of the Debtor and its operations and facilities. Section II provides an overview of the events that led to the filing of this Case. Section III describes provides a summary of the First Day Motions and factual bases for the relief requested therein.

## I.      GENERAL OVERVIEW

9.      The Debtor is a non-profit public charity, tax-exempt under section 501(c)(3) of the Internal Revenue Code. Debtor, as of the date hereof, had 24 brick and mortar sites including administrative sites, 2 pharmacies and 6 mobile units covering a service area consisting of a 250-mile corridor on the eastern side of San Diego and Riverside Counties, CA.  During 2021, Debtor provided approximately 386,000 patient care visits.

10.      The Debtor is also a federally qualified health center ("FQHC"). FQHCs are federally designated entities that receive federal grants and enhanced state payments to provide health care services to low-income and rural patients.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 South Figueroa Street , Suite 2500
Los Angeles, California 90017-5704
(213) 623-9300

Debtor's health services are targeted to families with incomes below 200% of the Federal Poverty Level ("FPL").  As an FQHC, Debtor strives to deliver high quality, comprehensive, compassionate primary health care to people in the surrounding area, regardless of ability to pay.

11.  The Debtor is also a Federal Tort Claims Act ("FTCA") "deemed facility."  Under section 224 of the Public Health Service Act, as amended by the Federally Supported Health Centers Assistance Acts of 1992 and 1995, employees of eligible health centers like Debtor may be deemed as federal employees for the purposes of liability protections under the FTCA for acts or omissions in the performance of medical, surgical, dental, or related functions resulting in personal injury, including death, and occurring within the scope of employment. Congress extended eligibility for FTCA protections to health centers like Debtor in order to increase the availability of funds for health centers to provide primary health care services by reducing or eliminating health centers' malpractice insurance premiums.

12.  The Debtor was organized in the early 1990s to operate a holistic health clinic in Borrego Springs, a small, unincorporated community in the northeast corner of San Diego County, California.  In 2002, when Debtor gained recognition as an FQHC, it operated one clinic in Borrego Springs with 17 employees providing 7,400 patient visits. Debtor has since grown to approximately 700 employees serving over 94,000 patients in 18 clinics and six mobile units throughout San Diego and Riverside counties, excluding Riverside Community Health Foundation ("RCHF") affiliated clinics.

13.  Debtor's programs aim to deliver culturally competent and linguistically appropriate care.  Debtor strives to be the community leader in improving the health of the populations in its service area, many of whom struggle with job and housing insecurity or disabilities. Its primary focus is the underserved, with an empowered workforce providing measurable quality and compassionate care to its patients. As of 2021, of Debtor's patients: (a) 94% have incomes below 200% of the FPL; (b)

71% live in poverty; (c) approximately 75% are Medi-Cal (Medicaid) recipients or participate in other public health programs; (d) 36% are under the age 18, and (e) 93% are under the age of 65.

14.     Debtor's services include comprehensive primary care, pediatric care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, telehealth, and pharmacy.

15.     Debtor is an active partner in the training of medical residents, medical students, nurse practitioner students, physician assistant students, nursing students and other healthcare professionals.

16.     Over 46% of the Debtor's total revenues come from government payors and the remainder comes from a combination of private pay private insurance, individual patients, pharmacy, and government grants.  Debtor's sources of income, based on last twelve months financial data, include: (a) Medi-Cal -  44%; (b) Medicare - 3%, and; (c) private payors - 2%.  Other sources of revenue include HRSA and other grants (as discussed below) and pharmacy operations.

17.     A significant source of liquidity for the Debtor are grants from the Health Resources & Services Administration ("HRSA"), which is an agency of the U.S. Department of Health and Human Services.  These grants vary in amounts and purposes, but generally are awarded for activities including: (a) retaining local community-based workforce to increase COVID-19 vaccine access; (b) as part of the American Rescue Plan Act Funding for Health Centers (commonly referred to as "ARP" funding); (c) Health Center Program Service Expansion - School Based Service Sites Program, (d) Health Center Infrastructure Support Program; and (e) for Health Center Programs ("HAC Program").  The HAC Program supports domestic public or private, nonprofit community-based and patient-directed organizations that provide primary health care services to the Nation's medically underserved populations.  The history of Debtor's HRSA awarded grants is available at the HRSA

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

website, at https://data.hrsa.gov/tools/find-grants.  However, Debtor received more than $38 million from HRSA between 2021 and YTD 2022.

18.    The Debtor has approximately over $5.2 million of cash on hand, $24 million of anticipated future revenue from HRSA and other grants over the next twelve months, and over $6 million of collectible patient and pharmacy related receivables.  Given the Debtor's operational and legal challenges, the Debtor currently operates at a monthly cash deficit of approximately $1.5 million.

19.    The Debtor has no secured debt.  The Debtor is not proposing or seeking any debtor-in-possession financing at this time.

## II.    CIRCUMSTANCES LEADING TO THE FILING OF THIS CASE

20.    In 2020, the Debtor's Board of Trustees became aware that members of the Debtor's leadership, certain landlords/contractors, and community dentists orchestrated what appears to be significant fraud for their own personal enrichment which involved filing false claims for dental services provided by contract dentists. In November 2020, the California Department of Health Care Services ("DHCS") issued a temporary suspension of payments for Medi-Cal services because of an ongoing fraud investigation into the outside, contract dental program. There were no accusations of any fraudulent acts associated with the in-house dental program or medical services. During the pendency of the suspension by DHCS, the Debtor provided thousands of services without compensation.

21.    Following the participation in a formal administrative meet and confer process, on February 26, 2021, the Debtor entered into a settlement agreement with the DHCS, pursuant to which DHCS agreed to lift the temporary suspension as it pertained to the reimbursement of Medi-Cal medical services.  The temporary payment suspension remains in place with respect to dental services.

22.    The Debtor has taken strong corrective actions and fully cooperated with state and federal investigators.  Among other steps taken by the Debtor in the fall of

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2020, the Debtor has: (a) terminated individual executives and others suspected of involvement in the apparent fraud; (b) removed any tainted members from the Board; (c) hired new leadership and added new board members with a high level of integrity and experience; (d) agreed to the appointment of a monitor, and fully cooperated with that monitor; (e) diligently completed corrective action plans; (f) initiated lawsuits against the bad actors; (g) created a corporate compliance department and instituted a robust compliance program; and (h) engaged reputable legal, IT, accounting, and financial consultants to guide it on its path to full responsibility and integrity.

23.     The Debtor initiated an internal investigation to identify wrongdoing by former associates, which led to the filing of pending litigation against the former trustees, officers, and contract dentists. The schemes included selling useless assets to Debtor at inflated prices, entering into one-sided agreements with Debtor to its detriment, committing and/or covering up healthcare fraud though improper billing of dental services, entering into leases with Debtor that were many times fair market rates and terms, paying themselves above-market salaries and benefits, and hiring friends and family members to work for Debtor and paying them above-market salaries.

24.     The Debtor is committed to taking all necessary steps to make amends for any past wrong behavior of former individuals and to make sure it has controls and systems in place to prevent any fraud to California and federal programs again. The Debtor no longer provides contract dental services, but only in-house dental services.

25.     While there were no accusations of any fraudulent acts associated with the in-house dental program, as set forth above, the Medi-Cal suspension on the Debtor's in-house dental payments has resulted in the DHCS withholding more than $7 million otherwise payable to the Debtor.

26.    In 2022, the Debtor, with the assistance of Ankura, developed and has been implementing a transformation plan which includes (i) revenue and profitability enhancement measures, and (ii) cost reductions and operational improvements.

27.    As part of that plan, the Debtor addressed excessive overhead and staffing for its current revenue trends with terminations and layoffs of approximately 245 in total and gave a WARN notice in connection therewith on or about December 2, 2021 and May 25, 2022.

28.    To date, the Debtor has implemented several initiatives in its transformation plan, leading to approximately $11.5 million improvement in net income on an annualized basis.

29.    The Debtor also recently sold three money losing RCHF affiliated clinics located in Riverside, California to Neighborhood Healthcare, a California nonprofit public benefit corporation ("Neighborhood").

30.    Despite the Debtor's best efforts, on August 26, 2022, DCHS notified the Debtor that its Medi-Cal payment, which constitute the majority of the Debtor's revenue, would be suspended as of September 29, 2022.  DCHS denied the Debtor's request to extend the date or rescind the proposed suspension.  Further, the Debtor has been notified by health plans, such as the Inland Empire Health Plan, that DCHS has instructed them to lodge, no later than September 9, 2022, "block transfer" plans with DHCS showing how the health plan would transfer all its members to other providers of medical services.  I am informed and believe that this is not a sufficient amount of time to transition the more than 90,000 patients treated annually by the Debtor to alternative care safely, and that there are simply no alternatives within a reasonable distance for many of Debtor's patients.

31.    The Debtor is filing this Case first to protect its patient population and explore all available restructuring options, particularly since its patient population faces risks as a result of recent steps taken by DHCS.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

### III.   FIRST DAY MOTIONS

32.   On September 12, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code")  in the United States Bankruptcy Court for the Southern District of California (the "Bankruptcy Court").  The Debtor requests that the relief described below in the First Day Motions be granted, as each request constitutes a critical element in achieving the successful restructuring of the Debtor for the benefit of its patients, creditors and the communities they serve. The Debtor intends to request for immediate relief with respect to the following First Day Motions and, therefore, will present these motions at the hearing.

*a.    Debtor's Emergency First Day Motion For Entry Of Order: (I) Authorizing The Debtor To (A) Pay Prepetition Employee Wages And Salaries, And (B) Pay And Honor Employee Benefits And Other Workforce Obligations; (II) Authorizing the Debtor to Pay Prepetition Agency Payment Obligations; And (III) Authorizing And Directing The Applicable Bank To Pay All Checks And Electronic Payment Requests Made By The Debtor Relating To The Foregoing; Memorandum Of Points And Authorities In Support Thereof (the "Wage Motion").*

33.   By the Wage Motion, the Debtor moves the Court for entry of an order: (i) authorizing, but not directing, the Debtor, in its discretion, to (a) pay or honor any outstanding prepetition wages, salaries, employee benefits, and other compensation, (b) remit withholding obligations, (c) maintain workers' compensation and benefits programs, (d) pay related administration obligations, and (e) pay reimbursable employee expenses (collectively, the "Employee Obligations"), with payments to each employee not to exceed the statutory limit for priority claims of $15,150; (ii) authorizing, but not directing, the Debtor, in its discretion, to pay its Temporary Staff (defined herein) for work performed prepetition via payment of Agency Payment Obligations (defined herein), with payments for each Temporary Staff member's prepetition services not to exceed the statutory limit for priority claims of $15,150;

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

and (iii) authorizing and directing the applicable bank to pay all checks and electronic payment requests made by the Debtor relating to the foregoing.

i.     The Debtor's Employees and Temporary Staff

34.     The Debtor employs approximately 697 employees, of which 631 are full-time and 66 are part time employees (collectively, the "Employees").

35.     Full-time, regular part-time and part-time ("core") Employees are regularly scheduled to work every pay period.  Temporary and per diem Employees are used on an as-needed basis.  Per diem Employees are called in whenever medical clinics cannot otherwise meet their core staffing requirements – for example, when core Employees are sick or on vacation, or there is a spike in patient census.  Also, because California requires the medical centers to maintain specific nurse-to-patient ratios, the Debtor uses *per diem* Employees to ensure the medical centers are in compliance with those requirements.

36.     In addition to the Employees, the Debtor regularly utilizes temporary staff members (the "Temporary Staff") each of whom is hired through one or several temporary employment agencies that has a contract with the Debtor, notably Roth Staffing ("Roth"), CompHealth Medical Staffing ("CompHealth") and AB Staffing ("AB," together with Roth and CompHealth, the "Agencies").  The number of Temporary Staff fluctuates based on the Debtor's needs.  Temporary Staff are not employees of the Debtor, and accordingly, are not eligible to participate in any employee benefits, health, or welfare plans. The Agencies pay the wages of the Temporary Staff and bill the Debtor on a weekly or monthly basis for the Temporary Staff (the "Agency Payment Obligations").  The Debtor estimates that it will pay Temporary Staff approximately $120,000 per month during this Case.  As of the Petition Date, the Debtor estimates that approximately $120,000 of Agency Payment Obligations are outstanding.  Payment of these Agency Payment Obligations is necessary to avoid harm to moral of the Temporary Staff and prevent any negative impact on Patient care.  Accordingly, the Debtor requests authority to pay the Agency

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Payment Obligations, as part of its ordinary course of business, whether the amounts are for services that arose pre or post-petition. The Debtor does not believe that any payment to an individual member of the Temporary Staff exceeds the $15,150 priority cap under section 507(a)(4) of the Bankruptcy Code.

ii.   Prepetition Wages, Payroll and Associated Benefits

37.   The Employees are paid wages and salaries (the "Wages") bi-weekly, in arrears, either five or six days after the end of every 14-day pay period, through direct deposit or by check. The Debtor's average bi-weekly gross payroll is approximately $2,100,000, which includes approximately $90,000 for executive payroll and $600,000 for withholding obligations (relating to various taxes, claims and other obligations).

iii.   The Debtor's Third-Party Payroll System

38.   The Debtor pays Employees on the even weeks, on Fridays for the preceding 14-day pay period running from Monday to Sunday. The Debtor's payroll is disbursed by Ceridian, a supplier of human resources and document services that provides the Debtor with payroll management and administration services. The Debtor normally funds its payroll to Ceridian on Wednesday prior to the pay date.

39.   The date on which Employees were last paid was September 2, 2022 for the two-week period ending August 28, 2022.

40.   Due to the imminent filing of this Case and the Debtor's desire to ensure that Employees receive timely payment for Wages earned prepetition, the Debtor prefunded the Employees' next routine payroll scheduled for September 16, 2022 (the "September 16th Payroll") by payment to Ceridian on Thursday, September 8, 2022. The September 16th Payroll is scheduled to be disbursed by Ceridian using the prefunded funds on September 16, 2022. The relief sought by this Motion seeks authority to make this scheduled payment without interruption.

41.   As of the Petition Date, the Debtor will owe Ceridian approximately $5,000 with respect to its processing of payroll and related payroll administration

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

matters (the "Administration Fees").  The Debtor requests authority to pay Ceridian the prepetition amount of $5,000 and to pay the post-petition Ceridian Administration Fees in the ordinary course of the Debtor's business.

42.    Accordingly, the Debtor seeks authority to pay any prepetition Wages that may remain outstanding, with payments to each Employee not to exceed the statutory limit for priority claims of $15,150, and to continue to pay Wages to Employees incurred post-petition in the ordinary course of the Debtor's business.

iv.    The Debtor's Withholding Obligations

43.    In the ordinary course of its business, the Debtor routinely withholds from the Wages certain amounts that the Debtor is required to transmit to the government and certain third parties for purposes such as Social Security and Medicare withholdings, federal and state or local income taxes, contributions to the Debtor's benefit plans, savings and retirement plan contributions, garnishment, child support or other similar obligations pursuant to court order or law (collectively, the "Withholding Obligations").  The Debtor pre-funded approximately $600,000 for Withholding Obligations – including payments for tax obligations (the "Employer Tax Obligations") such as FICA and Social Security – in connection with the payment of September 16th Payroll.  Accordingly, the Debtor seeks authority to pay any prepetition Withholding Obligations that remain outstanding on account of prepetition Wages; and to continue to pay Withholding Obligations incurred post-petition in the ordinary course of the Debtor's business.

v.    Business Expense Reimbursements

44.    The Debtor customarily reimburses Employees who incur business expenses in the ordinary course of performing their duties on behalf of the Debtor. Such expenses typically include, but are not limited to, business-related travel expenses (including mileage), business meals, relocation allowances, tuition reimbursement, and other items specified in the Borrego Health Employee Handbook (the "Reimbursement Obligations").  Expense reports detailing the Reimbursement

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

Obligations are submitted for reimbursement by the Employees and generally must be supported by copies of receipts.

45.    It is difficult for the Debtor to determine the exact amount of Reimbursement Obligations that is due and owing for any particular time period since the expenses incurred by Employees on behalf of the Debtor throughout the year vary on a monthly basis and because there may be some delay between when an Employee incurs an expense and submits the corresponding expense report for processing. Based on historical experience, the Debtor anticipates that, as of the Petition Date, the Debtor owes an estimated $20,000 in Reimbursement Obligations. Accordingly, the Debtor seeks authority to pay prepetition Reimbursement Obligations to its Employees. The Debtor further seeks to continue to pay Reimbursement Obligations incurred postpetition in the ordinary course of the Debtor's business.

vi.    Bonuses

46.    Certain Employees are eligible to receive sign-on bonuses (the "Bonuses"). Sign-on bonuses are provided to candidates for employment in hard-to-fill or critical vacancies. Sign-on bonuses are provided for candidates as a recruiting incentive in accordance to, and consistent with, industry standards.

47.    The Debtor is not, by this Motion, seeking permission to pay any Bonuses to continuing Employees, but does seek the authority, in the Debtor's discretion, to pay the Employees on account of contractually agreed bonuses that accrued within the 180 days prior to the Petition Date when their services with the Debtor are terminated up to and in accordance with section 507(a)(4)'s limit for priority claims of $15,150, taking into account (and not exceeding) all payments made on account of each Employee's priority prepetition Employee Obligations and Bonuses.

vii.    Paid Time Off

48.    Both regular full-time and regular part-time Employees are eligible for Paid Time Off ("PTO"). Eligible Employees may begin to use any accrued PTO time

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

after 90 days of employment.  The Debtor pays all accrued but unused PTO when an Employee leaves the Debtor.

49.     Eligible Employees accrue PTO annually based on hours worked up to forty (40) hours per week.  The maximum number of PTO hours Employees can accrue each year increases based on an Employee's continuous length of service.  When the maximum accrual cap for an Employee is reached, no further PTO will accrue until the Employee uses some of the accrued PTO.  As of the Petition Date, the Debtor is carrying approximately $2,300,000 on its books for 94,000 hours of accrued and unused PTO.

50.     The Debtor seeks authority to honor its existing PTO policies to the extent it would permit continuing Employees to use their prepetition accrued leave in the ordinary course of business, and going forward.  The Debtor seeks the authority, in its discretion, to pay the Employees for unused PTO, as permitted per employment policy, that accrued within the 180 days prior to the Petition Date so long as the total of the payments already then made for other prepetition Employee Obligations and the PTO does not exceed the statutory limit for priority claims of $15,150.

viii.   Employee Benefits

51.     The Debtor offers full-time Employees the opportunity to participate in a number of insurance and benefit programs, including, among other things, medical, dental and vision plans, life insurance, short-term and long-term disability insurance, workers' compensation, retirement plans and other insurance plans and benefits as described below (collectively, the "Employee Benefits").

a.   Medical, Vision and Dental Insurance

52.     The Debtor offers all eligible Employees and their eligible dependents (collectively, the "Dependents") medical, dental and vision insurance, which are primarily self-insured by the Debtor with the exceptions set forth below.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

53.     For medical, the Debtor offers eligible Employees a self-insured preferred provider organization plan (the "Self-Insured Medical Plan"). Meritain Health is the third-party administrator for all medical and prescription drug claims against the Self-Insured Medical Plan.

54.     Depending on whether and how many Dependents are covered, the Debtor's and Employees' respective monthly costs for the Self-Insured Medical Plan fall within the following ranges:

| Plan | Monthly Employer Cost | Monthly Employee Cost |
|---|---|---|
| Self-Insured Medical Plan | $550,000 - $3,400,000 | $50,000 - $60,000 |

55.     The Self-Insured Medical Plan is on a self-bill model, whereby the Debtor pays to Meritain Health: (i) monthly administration fees based on the number of insured Employees in the prior month and (ii) actual medical claims. As of the Petition Date, the Debtor believes it does not owe any prepetition administration fees to Meritain Health. As of the Petition Date, the Debtor owed approximately $1.3 million to Meritain Health on account of accrued and unpaid prepetition claims against the Self-Insured Medical Plan.

56.     For dental, the Debtor offers two MetLife plans (together, the "Dental Plans"). The Debtor bears between approximately 75% and 80% of the costs of the Dental Plans. Depending on the Employees' Dependent status, the Debtor's and Employees' respective monthly costs for the Dental Plans fall within the following ranges:

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

| Plan | Monthly Employer Cost | Monthly Employee Cost |
|------|------|------|
| MetLife DHMO | $6,000 - $10,000 | $2,000 - $5,000 |
| MetLife PPO | $35,000 - $55,000 | $10,000 - $15,000 |

57.     As of the Petition Date, the Debtor does not owe any amount to MetLife on account of accrued and unpaid prepetition claims against the Dental Plans. Also, as of the Petition Date, the Debtor believes it does not owe any prepetition administration fees to MetLife.

58.     For vision, the Debtor offers one MetLife plan (the "Vision Plan," and together with the Medical Plans and the Dental Plans, the "Health Plans"). The Debtor pays up to 80% of the costs of the Vision Plan. Depending on the Employees' Dependent status, the Debtor's and Employees' respective monthly costs for the Vision Plan falls within the following ranges:

| Plan | Monthly Employer Cost | Monthly Employee Cost |
|------|------|------|
| MetLife Vision | $4,000 - $5,000 | $800 - $1,000 |

59.     As of the Petition Date, the Debtor does not owe any amount to MetLife on account of accrued and unpaid prepetition claims against the Vision Plan. Also, as of the Petition Date, the Debtor believes it does not owe any prepetition administration fees to MetLife.

60.     The Debtor believes that it is current on the administration fees and premiums related to the Health Plans. To the extent it is not, however, the Debtor seeks authority to pay its portion of any premiums or administration fees for the Health Plans that accrued and remain unpaid as of the Petition Date as and when they come due. The Debtor also seeks authority to continue to pay, in its discretion and in the ordinary course of its business, the administration fees, premiums for and claims under the Health Plans incurred postpetition.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

61. For similar reasons, the Debtor seeks to continue to perform any obligations under section 4980B of the Internal Revenue Code to administer Continuation Health Coverage ("COBRA") in respect to former employees. The Debtor believes that any prepetition costs related to COBRA coverage benefits are *de minimis*, but nonetheless, to maintain Employee morale and ensure the orderly administration of the estate, the Debtor requests authority to pay in its discretion any such prepetition costs.

b. Employee Life, Disability, Workers' Compensation and Unemployment

62. The Debtor offers eligible Employees premium based group life insurance and supplemental life insurance (collectively, "Life Insurance") and accidental death and dismemberment insurance ("AD&D") through MetLife. The Debtor provides Employees Life Insurance coverage in the amount of $50,000 with premiums and other related charges paid 100% by the Debtor and total approximately $12,000 monthly on account of approximately 623 Employees. The Debtor provides Employees AD&D coverage in the amount of $50,000 with premiums and other related charges paid 100% by the Debtor and total approximately $2,000 monthly on account of approximately 623 Employees.

63. The Debtor also offers eligible Employees premium based short term ("ST") through Colonial. The Debtor pays 100% of premiums and other related charges for ST, totaling approximately $8,000 monthly, on account of 53 Employees.

64. The Debtor also provides workers' compensation insurance through BETA Healthcare (the "Workers' Compensation Insurance"). The amount of the annual premium is approximately $1,179,361 which is paid monthly in the amount of $98,280.

65. The Debtor also provides self-insured unemployment claim insurance (the "Unemployment Insurance Plan") for Employees. The Debtor's quarterly costs under the Unemployment Insurance Plan averages between $130,000 and $330,000.

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

501(c) Agencies Trust is the third-party administrator for all unemployment claims against the Unemployment Insurance Plan.

66.     The Unemployment Insurance Plan is on a self-bill model, whereby the Debtor pays to 501(c) Agencies Trust: (i) monthly administration fees based on the number of insured Employees in the prior month and (ii) actual unemployment claims.  As of the Petition Date, the Debtor believes it does not owe 501(c) Agencies Trust for any prepetition administration fees or any outstanding unemployment claims.

67.     In addition, as of the Petition Date, the Debtor owes approximately $4,000 to Aetna Resources for Living under an employee assistance program.

68.     The Debtor believes that it is current on all the above mentioned insurance policies and claims obligations.  To the extent it is not, however, the Debtor seeks authority, in its discretion, to pay any accrued and unpaid prepetition premiums and related charges and to continue the above benefits postpetition and to deliver the Employees' portion of any accrued and unpaid prepetition premiums to the corresponding administrators in connection with the payment of the Wages and Withholding Obligations.

c.     <u>Retirement Plans</u>

69.     The Debtor also offers eligible Employees the opportunity to participate in a defined 401(k) contribution plan through Principal (as recordkeeper) that allows for voluntary employee pre-tax deferrals (the "<u>401(k) Plan</u>").     Employees participating in this program may contribute up to the federal statutory cap per year, and the Debtor deducts the employee pre-tax deferrals from Employee paychecks for each pay-cycle.  Failure to timely forward the Employees' 401(k) Plan deductions may be a violation of the Employee Retirement Income Security Act of 1974, as amended ("<u>ERISA</u>"), resulting in potential liability for the Debtor's officers. Maintaining the 401(k) Plan as a part of the Employee Benefit Programs is critical to maintaining employee morale.

70.    The Debtor seeks authority to transfer Employee contributions in connection with the payment of Wages and withholding obligations described above. Administration fees for the 401(k) Plan are paid by Employee participants. The Debtor does not believe any 401(k) Plan payments will cause the total payments made for prepetition Employee obligations to exceed the statutory limit for priority claims of $15,150; however, if that is not the case, the Debtor believes that standard administration costs related to these retirement benefits are *de minimis*, and the Debtor requests authority to pay in its discretion any such prepetition costs to maintain employee morale and ensure the orderly administration of the estate.

d.    Miscellaneous Employee Benefit Plans

71.    Employees have the option to join the AirMedCare (Air Ambulance Benefit) Network via $50 payroll-deducted annual membership fee.  All of these programs are 100% funded by the Employees and are paid for through payroll deductions.  The Debtor requests authority to continue to honor these programs, in its discretion, and to continue distributing to third parties the payments for these programs in connection with the payment of Wages and Withholding Obligations as described above, including the distributions of payments that are for prepetition amounts due.

ix.    Support for Relief

72.    The Debtor believes that substantially all of its Employees and Temporary Staff rely exclusively on their compensation to pay their daily living expenses.  Also, the Employee Benefit Programs are a critical component of the Employees' total compensation package. It is imperative to the accomplishment of the Debtor's goals in this Case that the Debtor minimizes any adverse impact of the chapter 11 filing on the Debtor's workforce, patients, operations, and orderly administration of this Case.  Any disruption to payment of the payroll in the ordinary course, or to the continued implementation of employee programs in the Debtor's discretion, would adversely affect the Debtor's goals in this Case because such events

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

are likely to cause some employees to terminate their employment with the Debtor, will cause employees to be distracted from their duties to care for the patients, and will hurt employee morale at a particularly sensitive time for all employees. Failure to honor the Employee Obligations or Agency Payment Obligations could have severe repercussions on the Debtor's ability to preserve its assets and administer its estate, to the detriment of all constituencies. Accordingly, as set forth in the Wage Motion, the Debtor requests authority to continue paying the Employees and Temporary Staff and administering the Employee Benefit Programs and any obligations related to the foregoing (subject to any applicable priority payment caps in the Bankruptcy Code) in the ordinary course of business.

    ***b.    Emergency First Day Motion Of Debtor For Authority To: (1) Continue Using Existing Cash Management System, Bank Accounts And Business Forms; (2) Implement Changes To The Cash Management System In The Ordinary Course Of Business; (3) Remit Capitation Payments to the Purchaser of the Riverside Clinics; And (4) Obtain Related Relief; Memorandum Of Points And Authorities In Support Thereof (the "Cash Management Motion").***

73.    By the Cash Management Motion, the Debtor moves the Court for the entry of an order authorizing it to: (1) continue to use its cash management system, including the continued maintenance of its existing bank accounts and business forms; (2) implement changes to its cash management system in the ordinary course of business, including opening new or closing existing bank accounts; (3) remit capitation payments to or as directed by the purchaser of the Riverside Clinics (as discussed below); and (4) obtain related relief.

74.    The Debtor further requests, in the Cash Management Motion, that the Court authorize the financial institutions at which the Debtor's maintain various bank accounts to (a) continue to maintain, service and administer the Debtor's bank accounts, and (b) debit the bank accounts in the ordinary course of business on account of (i) wire transfers or checks drawn on the bank accounts, or (ii) undisputed

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

service charges owed to the Banks for maintenance of the Debtor's cash management system, if any.

75.    The Debtor currently has 6 accounts (the "Accounts") with two commercial banks, City National Bank ("CNB") and Community Valley Bank ("CVB" and together with CNB collectively the "Banks"). CNB is an authorized depository institution for District 16 under the guidelines of the Office of the United States Trustee. See Notice Of Requirements For Chapter 11 Debtors In Possession, available at www.usdoj.gov/ust/r16. CVB is not currently an authorized depository institution.

76.    Two of the CVB accounts are used to deposit receipts which would be difficult to get the payors to quickly redirect to the CNB collection account. The Debtor proposes to keep those two CVB accounts open, but to sweep each CVB account to the City National Bank ending in in 1993 whenever the balance in a CVB account exceeds $10,000. The Debtor will promptly close the CVB account ending in 8653.

77.    The Debtor requests authority to continue utilizing the Accounts. Requiring the Debtor to close certain of the Accounts and open new ones will disrupt the Debtor's cash flow – and, ultimately, impact patient care – because (i) the depositors (some of which are governmental agencies) will not respond quickly to the change and will likely continue to send deposits to the original deposit account, and (ii) the Debtor has certain obligations that they pay exclusively by electronic funds transfer and changes to the payment accounts have the potential of slowing down these crucial payments. Closing the Accounts will also increase the work of the Debtor's accounting personnel, who are already dealing with the many and varied issues related to this Case. Closing the Accounts and opening new ones under the circumstances described in the corresponding Memorandum of Points and Authorities would needlessly cost the Debtor time and money at a time when they

are trying to conserve both, and would result in no discernible benefit to the Debtor's bankruptcy estate.

78.    The Debtor also has under $15,000 of petty cash on hand at its various facilities.

79.    The Debtor also requests in the Cash Management Motion authority to continue using its business forms without the designation "Debtor in Possession" on it *for a limited time*.  The Debtor's forms are either electronically printed or can be electronically altered.  The Debtor seeks the authority of this Court to utilize its electronically generated forms without the "Debtor in Possession" designation until the adjustments to the software can be initiated and existing stock is exhausted.

80.    As discussed herein, the Debtor recently sold the assets of the Riverside Clinics[1] to Neighborhood and in connection with that transaction, the Debtor agreed to collect on behalf of Neighborhood and remit to Neighborhood certain capitation payments related to the Riverside Clinics for a transition period ending on or about October 1, 2022.  Debtor views those funds as belonging to Neighborhood and not constituting property of the Debtor's bankruptcy estate and proposed to remit those funds as received to or as directed by Neighborhood.

81.    In the Cash Management Motion, the Debtor requests that the Court authorize it to continue using its cash management system in connection with the continued use of Accounts and continued use of the Debtor's business forms; in furtherance thereof, the Debtor further requests that the Court authorize and direct the Banks to continue honoring the Debtor's transactions.

---

[1] The term "Riverside Clinics" references all assets, property and rights of the Debtor related to the operations of the following outpatient clinics located in Riverside County, California:  (i) Eastside Health Center Building A, located at 1970 University Ave., Riverside, CA; (ii) Eastside Health Center Building B, located at 1971 University Ave., Riverside CA; and (iii) Arlanza Family Health Center, located at 8856 Arlington Ave., Riverside, CA (collectively, the "Riverside Clinics").

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

***c.      Emergency First Day Motion Of Debtor For Order (A) Prohibiting Utilities From Altering, Refusing, Or Discontinuing Service And (B) Determining Adequate Assurance Of Payment For Future Utility Services (the "<u>Utilities Motion</u>").***

82.      By the Utilities Motion, the Debtor moves the Court for the entry of an order authorizing it to (i) prohibiting utilities (collectively, the "<u>Utility Companies</u>" and individually, a "<u>Utility Company</u>") from altering, refusing, or discontinuing service without further order of the Court; and (ii) determining adequate assurance of payment for future utility services. The Debtor receives essential utility services from several Utility Companies. Furthermore, the Debtor seeks a determination that: (i) a deposit made by the Debtor to each Utility Company in an amount equal to the one-half of the average monthly invoice for prepetition services provided to the Debtor by such Utility Company (the "<u>Deposit</u>") as set forth in Exhibit A to the Utilities Motion; (ii) the ability of any Utility Company to obtain an initial hearing on the adequacy of the Deposit; and (iii) the ability of any Utility Company to obtain an expedited hearing regarding further adequate assurance if the Debtor fail to cure a post-petition payment default within twenty (20) days after written notice of such default, constitute adequate assurance of payment for future utility services.

83.      As life-saving medical service providers, the Debtor is situated in a vulnerable position—without the continual flow of vital services of Utility Companies, the mission of the Debtor's business would unravel, irreparably harming the Debtor and its patients who seek medical care in the hospitals, medical centers, and clinics operated by the Debtor. Thus, I believe that in order to ensure the timely and proper care of the patients and maintain ongoing business operations, it is imperative the Debtor is able to rely on a consistent supply of these services.

84.      Specifically, uninterrupted electricity, gas, telephone, and similar services are essential to the Debtor's provision of medical services to the Debtor's patients. Any interruption, however brief, to utility services to the Debtor's business will result in a serious disruption of the Debtor's business operations and

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

dramatically affect patient care. Therefore, I believe that it is critical that the Court prohibit the Utility Companies from altering, refusing or discontinuing service to the Debtor without further order of this Court. The Deposit for each of the Utility Companies, coupled with the streamlined mechanism for requesting further adequate assurance will provide adequate assurance of payment to the Utility Companies as well as safeguard the Debtor's continuing operations.

85.     The Debtor is current on payment to the Utility Companies. Further, the Debtor has sufficient cash to pay its postpetition utility bills as they come due.

***d.      Emergency First Day Motion Of Debtor For (I) Authorizing the Debtor to (A) Maintain Insurance Program, (B) Pay Insurance Premiums and Brokerage Commissions in the Ordinary Course; (C) Continue Its Premium Financing Program; and (D) Pay All Obligations Associated Therewith; and (II) Preventing Insurance Companies From Enforcing Ipso Facto Clauses or Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay (the "Insurance Motion").***

86.     In the Insurance Motion, the Debtor requests (I) Authority to (A) Maintain Its Insurance Program, (B) Pay Insurance Premiums and Brokerage Commissions in the Ordinary Course; (C) Continue Its Premium Financing Program; and (D) Pay All Obligations Associated Therewith; and (II) Prevent Insurance Companies From Enforcing *Ipso Facto* Clauses or Giving Any Notice of Termination or Otherwise Modifying Any Insurance Policy Without Obtaining Relief From the Automatic Stay.

87.     The Debtor maintains various insurance policies issued by several insurance carriers (collectively, the "Insurance Carriers").   Collectively, these policies provide for coverage for, among other things: workers' compensation and employers liability, general liability, and professional liability, commercial property, commercial automobile, employee benefits and other coverage (collectively, the "Insurance Policies").  A schedule and summary of the Insurance Policies is attached as Exhibit B to the Insurance Motion.  As set forth in Exhibit B to the Insurance Motion, most of the Debtor's Insurance Policies will expire beginning on March 1,

DENTONS US LLP
601 SOUTH FIGUEROA STREET, SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300

2023 or later.  It is critical that the Debtor continues to carry the necessary insurance coverage to operate its business.  The Debtor seeks the authority to renew, modify, extend or enter into new Insurance Policies (collectively, the "New Insurance Policies") on a postpetition basis in the ordinary course of business.

88.    In certain instances, the Debtor pays premiums for its Insurance Policies in full at the beginning of the policy and in other instances in monthly installments as reflected in Exhibit B to the Insurance Motion.  Debtor also has premium financing in place for certain of its policies.  To ensure continued insurance coverage in the ordinary course of the Debtor's business, the Debtor seeks the authority to pay all premium payments or insurance financing payments that may come due on current Insurance Policies during the course of this Case.  The Debtor also seeks authority to pay all premiums associated with the New Insurance Policies on a postpetition basis in the ordinary course of business.

89.    The Debtor also seeks authority to pay its deductibles and self-insured retention amounts such amounts come due on a postpetition basis, including any amounts accrued and not due as of the Petition Date, in the ordinary course of business.

90.    The Debtor's insurance brokers are Marsh McLennan Agency and Arthur J. Gallagher.  Debtor seeks to pay brokerage commission and other amounts due to its brokers in the ordinary course of business.

91.    The Debtor also seeks to pay any claims administration costs in the ordinary course of business.

92.    The Debtor estimates that the total amount of pre-petition amounts owed related to its Insurance Programs as set forth above are approximately up to $275,000.

///

1        I declare under penalty of perjury that, to the best of my knowledge and after

2    reasonable inquiry, the foregoing is true and correct.

3        Executed this 12th day of September 2022, at Los Angeles, California.

4

5

6                            Isaac Lee

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DENTONS US LLP
601 SOUTH FIGUEROA STREET , SUITE 2500
LOS ANGELES, CALIFORNIA 90017-5704
(213) 623-9300