JEFFREY K. GARFINKLE (SBN: 153496)
BUCHALTER
A Professional Corporation
18400 Von Karman Avenue, Suite 800
Irvine, CA 92612-0514
Telephone: (949) 760-1121
Email: jgarfinkle@buchalter.com

Attorneys for MCKESSON CORPORATION,
on behalf of itself and certain corporate affiliates

# UNITED STATES BANKRUPTCY COURT

## SOUTHERN DISTRICT OF CALIFORNIA

### SAN DIEGO DIVISION

| | |
|---|---|
| In re<br><br>BORREGO COMMUNITY HEALTH FOUNDATION,<br><br>    Debtor and Debtor in Possession. | Case No. 22:BK-02384-11<br><br>Chapter 11<br><br>**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**<br><br>Hearing:<br>Judge:    Honorable Laura S. Taylor<br>Date:     December 7, 2022<br>Time:    2:00 p.m.<br>Place:    Jacob Weinberger United States Courthouse<br>           325 West F Street<br>           San Diego, CA 92101 |

McKesson Corporation ("McKesson"), on behalf of itself and its affiliate, McKesson Medical-Surgical Inc. ("MMS"), by and through its undersigned counsel, hereby files this Supplemental Opposition (the "Supplemental Opposition") with respect to the *Debtor's Motion for Entry of an Order Establishing Procedures for Monthly Payment of Fees and Expense Reimbursement* [ECF No. 143] (the "Motion").

1

MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 73508411v11

1. In McKesson's Opposition to the Motion [ECF No. 194], it explained why the Motion should be denied – without prejudice. Simply stated, the Debtor's request for procedures to pay professionals is, at best, premature given the Debtor's significant ongoing operating losses and the significant uncertainty surrounding the ultimate outcome of this case. And, estate professionals should not and cannot be favored over other, *pari passu* unpaid administrative claimants — including McKesson which holds an approximately $1.5 million administrative claim.

2. At the November 21, 2022 hearing, the Court provided McKesson the opportunity to offer supplemental briefing on two issues: i) other bankruptcy cases in which § 503(b)(9) and other types of administrative claims were not paid, while Chapter 11 professionals were paid in full and without disgorgement to equalize treatment among all Chapter 11 administrative creditors; and ii) the potential for the use of restricted Federal grants to pay Chapter 11 professionals. In addition to these two issues, McKesson addresses and responds to an argument made by Debtor's counsel about the supposed post-petition preferential treatment afforded to McKesson.

**Disparate Treatment Between Estate Professionals and § 503(b)(9) and Other Administrative Creditors.**

3. Throughout the country, and in particular Delaware and New York, financially distressed debtors frequently use Chapter 11 to sell their businesses and assets, often just to pay down secured debt obligations owed to its lenders. Unfortunately, in many of those cases, the debtors are left with insufficient proceeds to pay administrative claims and/or priority claims and are unable to confirm a plan. *See e.g.*, *Czyzewski v. Jevic Holding Corp.*, 137 S. Ct. 973 (2017). Their options are to either to convert the cases to Chapter 7 or seek dismissal of the bankruptcy cases.

4. In 2017, the Supreme Court issued its *Jevic* decision. In that decision, the Supreme Court ruled that structured dismissals that violate the priority rules of the Bankruptcy Code are impermissible.

2

MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 73508411v11

5. Under the priority rules of the Bankruptcy Code, all administrative creditors — regardless of the provision of the Bankruptcy Code under which those claims arise — must be treated equally. *See e.g.*, 11 U.S.C. §§ 503(b), 507(b), 1129, and 726.

6. Notwithstanding the *Jevic* case and the Bankruptcy Code's priority rules, some bankruptcy courts faced with administratively insolvent debtors continue to allow structured case dismissals without ensuring equal treatment of similarly situated administrative creditors. In those cases, one group of administrative creditors — namely the Chapter 11 professionals receive preferred treatment at the expense of the other Chapter 11 administrative creditors.

7. McKesson and MMS are the largest distributors of pharmaceutical and medical-surgical goods products in the United States. As a result, McKesson and MMS often hold significant § 503(b)(9) administrative claims in its customers' bankruptcy cases. For example, in this case, McKesson and MMS hold an approximately $1.5 million administrative claim for pharmaceutical and medical-surgical products delivered to the Debtor during the 20 days immediately prior to the Petition Date.

8. McKesson's most recent experience with a structured dismissal that had grossly disparate treatment between Chapter 11 case professionals and other Chapter 11 administrative claimants is the Chapter 11 bankruptcy case of The Great Atlantic & Pacific Tea Company (A&P). *See In re The Great Atlantic & Pacific Tea Company, Inc., et al.*, Case No. 15-23007-LGB (Bankr. S.D.N.Y. 2015). A&P was a New York regional supermarket chain that had over 100 in-store pharmacies. It filed Chapter 11 in the Southern District of New York in July 2015 to effectuate a wind down and liquidation of its stores, pharmacies and other assets.

9. Six years after completing its asset liquidation, A&P had about $40+ million of unpaid administrative creditors, including more than 300 vendors holding § 503(b)(9) claims. McKesson is one of those unpaid administrative creditors. It holds a $1.75 million § 503(b)(9) claim.

10. In March 2021, A&P and the official committee of unsecured creditors filed a "Joint Motion for Entry of an Order Authorizing Final Resolution of Debtors' Cases and Granting Related

3

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**

BN 73508411v11

Relief." [ECF No. 4726]. Over McKesson's objection [ECF No. 4770], the New York Bankruptcy Court granted that motion. [ECF No. 4810].[1] In so doing, Chapter 11 estate professionals were permitted to keep 100% of their interim fee payments without disgorgement, while the other Chapter 11 administrative creditors (including McKesson) only received a 20% recovery on their allowed administrative claims.

11. McKesson recognizes the case law that holds disgorgement of Chapter 11 professional fees is not required when such fees are paid from a secured party's carve-out funds. *See e.g.*, *In re ACI Concrete Placement of Kansas, LLC*, 604 B.R. 400, 405 (Bankr. D. Kan. 2019). But that case law does not apply to this case. There are no secured creditors. As such, all unpaid administrative creditors are on equal footing with respect to the Debtor's available post-petition unrestricted funds (after payment of the Debtor's day-to-day post-petition operating expenses).

12. Based on the foregoing, either i) all unpaid administrative creditors, including the Chapter 11 professionals, must be paid from unencumbered and unrestricted funds on a *pari passu* basis; or ii) to the extent interim payments are made to the Chapter 11 professionals, such payments must be subject to mandatory disgorgement should the Debtor be administratively insolvent. And that disgorgement would apply regardless as to whether the Debtor's bankruptcy case is converted to Chapter 7 or dismissed.

**Use of Restricted Grant Funds**

13. In McKesson's initial Opposition to the Motion, it questioned whether the Debtor intends to pay Chapter 11 estate professionals through grants provided by the Federal government and the State of California. It is McKesson's position that certain of those grants can only be used to pay approved operational expenses, such as for the purchase of pharmaceutical and medical-surgical products used by the Debtor in the operation of its business.

14. Minutes after McKesson filed its initial Opposition, the U.S. Department of Health and Human Services ("HHS") filed its initial Opposition to the Debtor's sale/bidding procedures

---

[1] In the A&P case, McKesson was a member of the Committee. Pachulski, Stang, Ziehl & Jones was committee counsel.

4

**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 73508411v11

motion. [ECF No. 206]. That Opposition, and the supporting declarations, support McKesson's position.

15. HHS's Opposition contains a chart listing four grants provided to the Debtor by HHS's Health Resources & Services Administration ("HRSA") program. HHS Opp. to Sale Motion, p. 5. As HHS states, "These grants are on 'advance drawdown restriction,' which means that before any available funds are transferred to the Debtor's account, the Debtor must submit a request to HRSA detailing the amount needed and how the funds will be used. Only if HRSA approves the request are the funds released to Borrego. Debtor must also provide an annual Federal Financial Report regarding use of HRSA funds." *Id*.

16. HHS's Opposition then addresses "Provider Relief Bureau Funds." HHS Opp. to Sale Motion, p. 6. Again, quoting HHS's opposition regarding this grant:

> Since the Provider Relief Fund ("PRF") was created in April 2020, the Debtor received a total of $17,608,363.54 in PRF distributions and has yet to report on its use of $6,011,481 of these funds. …
>
> [PRF recipients] also must report their use of such funds during the applicable, 'Reporting Time Period,' approximately twelve to eighteen months after disbursement. If a PRF recipient does not comply with the PRF Terms and Conditions, the recipient must repay the PRF distributions to HRSA.

*Id.* at pp. 6-7.

17. McKesson understands that the Debtor's position is that it has unfettered access to any remaining grant funds and that such funds can be used to pay non-operating expenses such as Chapter 11 professional fees. McKesson has a completely different view on the issue. Any grant moneys must be used in strict accordance with the restrictions and limitations of the applicable Federal and State of California grants. And, as is apparent from HHS's description of the current grants, none of those grants are for the use of funds to pay Chapter 11 professional fees. Rather, they must spent for the intended purpose of the applicable grant.

18. The Debtor's largest grant is the "American Rescue Plan Funding for Health Centers (H8F)." HHS Opp. to Sale Motion, p. 5. That grant runs from April 1, 2021 through March 31, 2023 and is for $36,903,375.

5

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**

BN 73508411v11

19. HHS's website contains the following description of permitted uses of H8F's grant funds:

> Funds made available through this funding opportunity are required to be used for the following purposes:
>
> - Plan, prepare for, promote, distribute, administer, and track COVID–19 vaccines, and carry out other vaccine-related activities.
>
> - Detect, diagnose, trace, and monitor COVID–19 infections and related activities necessary to mitigate the spread of COVID–19, including activities related to, and equipment or supplies purchased for, testing, contact tracing, surveillance, mitigation, and treatment of COVID-19.
>
> - Purchase equipment and supplies to conduct mobile testing or vaccinations for COVID-19, purchase and maintain mobile vehicles and equipment to conduct such testing or vaccinations, and hire and train laboratory personnel and other staff to conduct such mobile testing or vaccinations, particularly in medically underserved areas.
>
> - Establish, expand, and sustain the health care workforce to prevent, prepare for, and respond to COVID–19, and to carry out other health work force-related activities.
>
> - Modify, enhance, and expand health care services and infrastructure.
>
> - Conduct community outreach and education activities related to COVID–19.[2]

20. Per these guidelines, payment of Chapter 11 professional fees is not a permitted use of H8F funds. On the other hand, payment of operating expenses, such the costs of pharmaceutical and medical-surgical products is a permitted use of H89F funds.

**McKesson Is Not Receiving Preferred Treatment on Account of Post-Petition Trade Credit**

21. During the hearing on November 21, 2022, the Debtor argued that McKesson has received preferred treatment by virtue of a $600,000 deposit posted to ensure that McKesson is paid for the hundreds of thousands of dollars of pharmaceuticals products purchased by the Debtor on a

---

[2] FY 2021 American Rescue Plan Funding for Health Centers (H8F) Activities and Allowable Uses of Funds, HRSA https://bphc.hrsa.gov/funding/coronavirus-related-funding/fy-2021-american-rescue-plan-funding-health-centers-h8f/allowable-uses

6

MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

BN 73508411v11

post-petition weekly basis. Based on these agreed-upon credit terms, the Debtor argues that McKesson's objection to the Chapter 11 professional's interim compensation procedures should be overruled.

22. The Debtor is mixing apples and oranges.

23. The Debtor owns and operates brick and mortar healthcare locations, including administrative sites, pharmacies, and mobile units covering a service area consisting of a 250-mile corridor on the eastern side of San Diego and Riverside counties. *See* ECF No. 7, ¶ 9. It provides primary care, pediatric care, urgent care, behavioral health, dental services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, telehealth, and pharmacy and pharmaceutical dispensing services to roughly 100,000 patients. *See e.g.*, ECF No. 7, ¶ 9.

24. Thus, in the ordinary course of the Debtor's post-petition business operations, it incurs day-to-day expenses, all of which must be paid on an ongoing basis. These include salaries to its employees, post-petition rent to its landlords, and the goods, supplies and ancillary services needed to provide the healthcare services to its thousands of patients. In fact, the Debtor's September 2022 operating report lists $1.175 million in unpaid post-petition payables. [ECF No. 172; p. 2, line 2f].

25. Prior to the bankruptcy filing, the Debtor was purchasing (on agreed-upon credit terms) the bulk of its pharmaceutical products from McKesson. During the weeks immediately preceding the Petition Date, those pharmaceutical purchases ranged between $400,000 and $500,000 per week.

26. In light of the nearly $2 million owed to McKesson on the Petition Date, immediately upon learning of the bankruptcy filing, McKesson suspended any credit sales to the Debtor. If the Debtor wanted to purchase pharmaceutical and medical-surgical goods from McKesson, it would needed to pay in advance of delivery.

27. Given the size and scope of the Debtor's pharmaceutical and healthcare operations, an advance payment structure for the purchase of pharmaceutical products presented serious

7

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**

BN 73508411v11

logistical and operational problems to the Debtor and imperiled the needs of some of its patients. As a result, the Debtor and McKesson negotiated regarding post-petition pharmaceutical purchases and acceptable credit terms.

28. Those negotiations resulted in the Debtor and McKesson agreeing to one-week revolving credit terms for the purchase of pharmaceutical products provided the Debtor provided a deposit equal to between one week and one and one-half weeks of projected purchases ($600,000).

29. This structure is commonly used throughout the country when bankrupt debtors need to have a continuing supply of goods or services during the course of their bankruptcy cases. By way of example, during the five month pharmacy liquidation in the A&P bankruptcy cases (discussed above), A&P continued to purchase pharmaceutical products from McKesson on one day sales outstanding (DSO) credit terms, with a $2 million deposit.

30. As to the $600,000 deposit held by McKesson, it only applies to post-petition credit purchases. It is not available for any of McKesson's pre-bankruptcy claims, including its $1.5 million § 503(b)(9) administrative claim. Contrary to the Debtor's arguments at the November 21 hearing, McKesson has not received and is not receiving any post-petition preferential treatment on account of its unpaid $1.5 million pre-petition § 503(b)(9) administrative claim.

31. One final, but very important note: If the Debtor is correct that parties transacting with debtors in possession are subject to disgorgement of routine post-petition payments for the goods and services provided to debtors in the ordinary course of business, then commercial parties will stop doing business with Chapter 11 debtors. On the other hand, Chapter 11 professionals make the voluntary decision to participate in bankruptcy cases, all the while understanding the risk of administrative insolvency and the resulting disgorgement of interim fee payments. As such, they are subject to being required to share, on a *pari passu* basis, unrestricted and unencumbered estate funds with unpaid Chapter 11 administrative creditors, such as vendors holding § 503(b)(9) claims, including funds that are paid on an interim basis.

32. At least one other court in this District recognized the difference between trade creditors receiving post-petition payments on account of post-petition goods and services and

8

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT

BN 73508411v11

Chapter 11 professionals and that Chapter 11 professionals bear the risk of administrative insolvency. *In re Lochmiller Indus., Inc.*, 178 B.R. 241 (Bankr. S.D. Cal. 1995). As former Bankruptcy Judge Peter Bowie aptly stated in *Lochmiller*:

> Code section 1108, together with sections 363(c)(1) and 1107, authorizes a debtor in possession, such as the [debtors], to make payments to trade creditors without prior Court approval so long as such payments are made in the ordinary course of the debtor's business. … Although the Code provides no express priority between payments made to trade creditors in the ordinary course and those made to professionals pursuant to Code sections 330 and 331, the cases addressing this issue have uniformly held that payments made in the ordinary course may not be recovered.
>
> ***
>
> In this Court's view, statutory authorization for payment of ordinary course expenses contrasts with the discretionary authorization to award interim compensation to professionals, (11 U.S.C. § 363 and §§ 330 and 331), and supports such a result.

*Id.* at 247, 250.

For all of these reasons and the reasons set forth in McKesson's original objection, the Motion should be denied without prejudice.

DATED: November 23, 2022                BUCHALTER, a Professional Corporation

By:  /s/ *Jeffrey K. Garfinkle*
         JEFFREY K. GARFINKLE

Counsel for MCKESSON CORPORATION, on behalf of itself and certain corporate affiliates

BUCHALTER
A PROFESSIONAL CORPORATION
IRVINE

9

**MCKESSON CORPORATION'S SUPPLEMENTAL OPPOSITION TO DEBTOR'S MOTION FOR ENTRY OF AN ORDER ESTABLISHING PROCEDURES FOR MONTHLY PAYMENT OF FEES AND EXPENSE REIMBURSEMENT**

BN 73508411v11