SAMUEL R. MAIZEL (SBN 189301)
samuel.maizel@dentons.com
TANIA M. MOYRON (SBN 235736)
tania.moyron@dentons.com
REBECCA M. WICKS (SBN 313608)
rebecca.wicks@dentons.com
DENTONS US LLP
601 South Figueroa Street, Suite 2500
Los Angeles, CA 90017-5704
Telephone: 213-623-9300
Facsimile: 213-623-9924
Attorneys for Chapter 11 Debtor
And Debtor in Possession

RANDY S. GROSSMAN
United States Attorney
LESLIE M. GARDNER (Cal. Bar No. 228693)
Assistant U.S. Attorney
Office of the U.S. Attorney
Southern District of California
880 Front Street, Room 6293
San Diego, CA 92101-8893
Telephone: 619-546-7603
Email: leslie.gardner2@usdoj.gov
Attorneys for U.S. Department
of Health and Human Services

**UNITED STATES BANKRUPTCY COURT**

**SOUTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| In re:<br><br>BORREGO COMMUNITY HEALTH FOUNDATION,<br><br>Debtor. | Case No. 22-BK-02384-LT11<br><br>Chapter 11<br><br>**STIPULATION BETWEEN THE DEBTOR AND U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES** |

Borrego Community Health Foundation (the "Debtor"), and the Secretary (the "Secretary") of the U.S. Department of Health and Human Services ("HHS"), on

1

behalf of the Centers for Medicare & Medicaid Services ("CMS," and collectively with the Secretary, HHS and the Debtor, the "Parties"), by and through their respective counsel, enter into this Stipulation (the "Agreement") resolving the following HHS objections: (i) *Opposition to Debtor's Notice Of Motion And Motion For Entry Of (I) An Order (1) Approving Form Of Asset Purchase Agreement; (2) Approving Auction Sale Format And Bidding Procedures; (3) Approving Process For Discretionary Selection Of Stalking Horse Bidder And Bid Protections; (4) Approving Form Of Notice To Be Provided To Interested Parties; (5) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest And Best Bidder; And (6) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; And (II) An Order Authorizing The Sale Of Property Free And Clear Of All Claims, Liens And Encumbrances* [Docket No. 206] (the "Sale Objection"); (ii) *Supplemental Opposition to Debtor's Sale Motion* [Docket No. 491] (the "Supplemental Sale Objection"); and (iii) *Objection to Debtor's Notice to Counterparties to Executory Contracts and Unexpired Leases of the Debtor that may be Assumed and Assigned filed on January 16, 2023* [Docket No. 458] (the "Cure Notice Objection").

**RECITALS**

WHEREAS, on September 12, 2022, the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"). Since the commencement of its Case, the Debtor has been operating its business as a debtor in possession pursuant to §§ 1107 and 1108.

WHEREAS, the Debtor is a nonprofit Federally Qualified Health Center ("FQHC") that provides health care services to low income and rural patients in San Diego and Riverside Counties through a system of eighteen clinics, two pharmacies, and six mobile units (collectively, the "Facilities"). In 2021, the Debtor provided approximately 386,000 patient care visits to over 94,000 patients. The Debtor's services include comprehensive primary care, urgent care, behavioral health, dental

123359760\V-1

services, specialty care, transgender health, women's health, prenatal care, veteran's health, chiropractic services, tele-health, and pharmacy.

WHEREAS, FQHCs are federally designated entities that receive higher state payments to provide health care services to low-income and rural families and families in underserved communities with incomes below 200% of the poverty level. As an FQHC, the Debtor strives to deliver high quality, comprehensive, compassionate primary health care to people in the surrounding area, regardless of ability to pay.

WHEREAS, additional background regarding the Debtor, including an overview of the Debtor's business and additional events leading up to this Case, is set forth in the Declaration of Isaac Lee, Chief Restructuring Officer, in Support of Debtor's Emergency First Day Motions [Docket No. 7].

WHEREAS, Medicare is a federal health care program for people who are 65 or older, certain younger people with disabilities, and people with end-stage renal disease. Medicare is administered by CMS, a federal agency that is part of HHS. Individuals who receive benefits under Medicare are referred to as Medicare "beneficiaries." Medicare enters into agreements with providers and suppliers to establish their eligibility to participate in the Medicare Program. Providers and suppliers complete a Medicare Enrollment Application (often called a Form CMS-855) whereby the providers and suppliers must certify compliance with certain federal requirements.

WHEREAS, the Debtor holds 41 Medicare provider numbers, 24 active and 17 deactivated. CMS administers the funds Debtor receives under its Medicare Provider Agreements (the "Debtor's <u>Medicare Provider Agreements</u>"). CMS utilizes Medicare contractors National Governmental Services and Nordian Healthcare Solutions to assist it in administering the Debtor's Medicare Provider Agreements. Under the Medicare Provider Agreements, the Debtor must submit cost reports on an annual basis for each cost report year. Cost reports are due on or before the last day of the fifth month following the close of the Debtor's cost report year. 42 C.F.R. § 413.24.

3

CMS reviews the Debtor's cost report submission to make any necessary adjustments as required by section 1395g(a) of the Medicare statute.

WHEREAS, the Debtor has yet to submit the cost reports due for fiscal years ending in 2021 and 2022 (the "Open Cost Reporting Periods"). If a provider has failed to timely file an acceptable cost report, the regulations require that payment to the provider is immediately suspended in whole or in part until a cost report is filed and determined by the Medicare contractor to be acceptable. 42 C.F.R. § 405.371. Pursuant to regulations, HHS stopped paying the Debtor for treatments for Medicare beneficiaries after the Debtor did not file the cost reports due in 2021 and 2022. The outstanding cost reports are identified in the Declaration of Brian Flett and Exhibits 1-9 attached thereto, at Docket No. 458. The Debtor estimates that it is owed more than $2 million on unpaid Medicare services. These amounts are being withheld by CMS or by a Medicare contractor at CMS's direction (the "CMS Withheld Amount"). Additionally, the Debtor continues to treat Medicare beneficiaries and bill Medicare accordingly but is not being paid for those services. Thus, the CMS Withheld Amount continues to increase.

WHEREAS, on November 10, 2022, the Debtor filed its *Debtor's Notice Of Motion And Motion For Entry Of (I) An Order (1) Approving Form Of Asset Purchase Agreement; (2) Approving Auction Sale Format And Bidding Procedures; (3) Approving Process For Discretionary Selection Of Stalking Horse Bidder And Bid Protections; (4) Approving Form Of Notice To Be Provided To Interested Parties; (5) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest And Best Bidder; And (6) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; And (II) An Order Authorizing The Sale Of Property Free And Clear Of All Claims, Liens And Encumbrances* [Docket No. 161] (the "Sale and Bidding Procedures Motion").

WHEREAS, on November 18, 2022, HHS filed its Opposition to the Sale and Bidding Procedures Motion [Docket No. 206].

123359760\V-1

1      WHEREAS, on December 2, 2022, the Debtor filed its *Omnibus Reply to Objections of (1) the U.S. Department of Health and Human Services, and (2) the California Department of Health Care Services, to Debtor's Bid Procedures Motion* [Docket No. 261] (the "Government Omnibus Reply").

2      WHEREAS, on December 3, 2022, the Committee filed its *Joinder of the Official Committee of Unsecured Creditors in Support of Debtor's Omnibus Replies to Oppositions to Debtor's Motion And Motion For The Entry Of (I) An Order (1) Approving Form Of Asset Purchase Agreement For Stalking Horse Bidder And For Prospective Overbidders To Use, (2) Approving Auction Sale Format, Bidding Procedures And Stalking Horse Bid Protections, (3) Approving Form Of Notice To Be Provided To Interested Parties, (4) Scheduling A Court Hearing To Consider Approval Of The Sale To The Highest Bidder And (5) Approving Procedures Related To The Assumption Of Certain Executory Contracts And Unexpired Leases; And (II) An Order (A) Authorizing The Sale Of Property Free And Clear Of All Claims, Liens And Encumbrances* [Docket No. 262].

3      WHEREAS, on December 7, 2022, the Court heard the Sale and Bidding Procedures Motion and approved the bid procedures (the "Bid Procedures") and sale process (the "Sale") of substantially all of the Debtor's assets (the "Assets"). The Court found that the HHS objection was premature and continued such objection to the hearing on the Sale (the "Sale Hearing").

4      WHEREAS, on December 19, 2022, the Court entered the *Court Modified Order (I) (1) Approving Form of Asset Purchase Agreement; (2) Approving Auction Sale Format and Bidding Procedures; (3) Approving Process for Discretionary Selection of Stalking Horse Bidder and Bid Protections; (4) Approving Form of Notice to be Provided to Interested Parties; (5) Scheduling a Court Hearing to Consider Approval of the Sale to the Highest and Best Bidder; and (6) Approving Procedures Related to the Assumption of Certain Executory Contracts and Unexpired Leases; and*

*(II) Authorizing the Sale of Property Free and Clear of All Claims Liens and Encumbrances* [Docket No. 321].

WHEREAS, on February 13, 2023, HHS filed an Objection to Debtor's Cure Notice [Docket No. 458].

WHEREAS, on February 21, 2023, HHS filed the Supplemental Sale Objection [Docket No. 491] (collectively, with Docket Nos. 206 and 458, the "HHS Objection").

WHEREAS, on February 24, 2023, the Debtor filed the (i) *Memorandum in Support of Entry of an Order: (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens, and Encumbrances; (B) Authorizing the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (C) Granting Related Relief; Declaration of Isaac Lee* [Docket No. 506], and (ii) *Omnibus Reply in Response to the Objections to the Debtors Motion for Entry of an Order: (A) Authorizing the Sale of Property Free and Clear of All Claims, Liens, and Encumbrances; (B) Authorizing the Assumption and Assignment of Designated Executory Contracts and Unexpired Leases; and (C) Granting Related Relief* [Docket No. 507]. This Memorandum explains that the Desert Aids Project d/b/a DAP Health ("DAP Health") was the winning bidder on the Debtor's assets at a purchase price of approximately $50 million.

WHEREAS, on March 1, 2023, the Court held a hearing and approved the Sale to DAP Health as described in its tentative ruling [Docket No. 519]; an order approving the sale has not yet been entered. The Sale terms provide that DAP Health will close the Sale (the "Transfer Effective Date") if and when, among other things, the Successor-In-Interest Request has been approved by the Health Resources and Services Administration.

WHEREAS, to resolve the HHS Objection, avoid unnecessary motion practice regarding HHS's claims, and avoid any possible impediment to the Sale to DAP Health, the Debtor and CMS have reached an agreement.

123359760\V-1

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which is mutually acknowledged by the Parties hereto, intending to be legally bound, but subject to approval by the Bankruptcy Court, the Parties agree as follows:

**AGREEMENT**

1. The recitals set forth above are incorporated herein by reference.

2. The Debtor agrees that it will: (a) transfer the Medicare Provider Agreements as executory contracts, pursuant to section 365 of the Bankruptcy Code, with the cure amount unliquidated pending submission of the two outstanding cost reports (collectively, the "Unfiled Cost Reports") as well as any closing cost report (the "Final Cost Report"), and audit of those reports by the Medicare Administrative Contractor or CMS; (b) submit the Unfiled Cost Reports no later than April 30, 2023; and (c) allow CMS to hold the CMS Withheld Amount pending submission of the Final Cost Report which must be submitted by the Debtor through the Transfer Effective Date (the "Final Cost Report Period") and completion of CMS's post-payment audit(s) of the Final Cost Report involving services rendered and dates of service during the Final Cost Report Period.

3. The Debtor further agrees that CMS will be allowed to: (a) offset and/or recoup any overpayments for the Open Cost Reporting Periods asserted against the Debtor from the CMS Withheld Amount; and (b) to the extent that CMS asserts and identifies overpayments against the Debtor for the Open Cost Reporting Periods in excess of the CMS Withheld Amount, allow CMS to offset and/or recoup in the ordinary course of business, any such overpayments from ongoing payments from the Medicare program due to the Debtor for claims involving services rendered and dates of service prior to the Transfer Effective Date but otherwise during the Open Cost Reporting Periods.

4. For the avoidance of doubt, the cure amount (the "Cure Amount") to be paid pursuant to section 365 of the Bankruptcy Code for Medicare overpayments

consists of and is limited to the CMS Withheld Amount, which funds shall constitute the sole remedies available to Medicare for the recovery of Medicare overpayments from Medicare claims for services rendered prior to the Transfer Effective Date.

5. DAP Health shall not be liable for any overpayments alleged to have been incurred by the Debtor prior to the Transfer Effective Date. This Settlement resolves all disputes between CMS and the Debtor arising out of the Medicare Provider Agreements. Notwithstanding the foregoing, CMS will have the right to seek payment of subsequently discovered overpayments or amounts due the Medicare program for the cost reporting period ending immediately preceding the Transfer Effective Date exclusive of the amounts already in the Cure Amount.

6. The Parties agree that the CMS Withheld Amount represents CMS's sole remedy for any claims for overpayment it holds against the Debtor occurring prior to the Transfer Effective Date with respect to the Medicare Provider Agreements currently in effect between the Debtor and the Secretary of the Department of Health and Human Services. The Parties further agree that CMS shall have no recourse against DAP Health for any claims, causes of action, or liability arising from acts or omissions of Debtor occurring prior to the Transfer Effective Date.

7. CMS further agrees that the overpayments recouped pursuant to this settlement are in full satisfaction, discharge, and release of any and all claims for overpayment CMS may have against the Debtor or DAP Health for the Debtor's Medicare obligations incurred on or before the Transfer Effective Date, whether such claims are known or unknown, liquidated, or contingent. This release of the Debtor includes the Debtor's current officers, directors, and employees with regard to any overpayment liability.

8. The Parties agree that the relevant CMS contractors will issue Notices of Program Reimbursement regarding the amounts owed to CMS or to Debtor. The Parties agree that if the Debtor does not agree with the determination of the CMS

123359760\V-1

contractors, the Debtor may pursue the administrative remedies available to it under 42 C.F.R. Part 405 Subpart R.

9. Within 15 calendar days of the Transfer Effective Date, Debtor will withdraw any appeals related to the Provider Agreements that are pending either administratively (including, but not limited to, appeals before the Provider Reimbursement Review Board ("PRRB") or the Departmental Appeals Board) or before any Federal court, and agrees to not bring any further appeals thereafter, relating to events and cost-reporting periods prior to the Transfer Effective Date. If, upon notice, the Debtor fails to timely withdraw such appeals, this Agreement constitutes the consent of Debtor for counsel for the provider's Medicare fiscal intermediary/Medicare Administrative Contractor or for CMS to file such a withdrawal(s) on its behalf.

10. The Parties agree that CMS will: (a) diligently process the change of ownership applications required for the transfer of the Medicare Provider Agreements.

11. The Parties agree that CMS will promptly, and in no event later than ninety (90) days following the completion of the review of the cost reports, remit to the Debtor, any balance owed to the Debtor of the Debtor's Medicare underpayments after CMS offsets and/or recoups any overpayments from ongoing payments from the Medicare program due to the Debtor for claims involving services rendered and dates of service during the Open Cost Reporting Periods.

12. The covenants of the Parties herein shall be effective as of the Transfer Effective Date, provided that the Bankruptcy Court has approved the transfer of the Medicare Provider Agreements to DAP Health. For the avoidance of doubt, the rights provided herein constitute the sole remedies available to CMS and CMS cannot otherwise seek payment from or recourse against DAP Health and or against any of its assets, including, without limitation, any assets acquired by DAP Health from the

Debtor, for liabilities or conduct arising from the period before the Transfer Effective Date.

13. The Debtor shall timely file terminating cost reports for the Facilities through the date immediately preceding the Transfer Effective Date; and DAP Health shall be responsible to file partial cost reports to cover the period from the Transfer Effective Date to the end of the fiscal period in which the Transfer Effective Date falls. CMS agrees that the recoupment and offset rights granted to CMS pursuant to Paragraphs 2-4 shall constitute a "cure" under § 365 of the Bankruptcy Code, and any otherwise applicable law, statute or regulation, of all outstanding financial defaults arising under or in connection with the Medicare Provider Agreements and the goods and services provided prior to the respective Transfer Effective Dates, and any corresponding requests for payment made thereunder (collectively, the "Cure"). In addition, the Cure fully satisfies, discharges, and constitutes a release of all claims, known or unknown, that CMS has or may have against DAP Health for liability or conduct arising under or in connection with the Medicare Provider Agreements for periods before the Transfer Effective Date; provided, however, that DAP Health shall succeed to the quality history associated with the relevant Medicare Provider Agreements assigned and shall be treated, for purposes of survey and certification issues, as if it is the relevant owner and no change of ownership occurred.

14. For the avoidance of doubt, as of the Transfer Effective Date, CMS is authorized to adjust all payments to DAP Health to account for any liabilities, overpayments or underpayments relating to services rendered on or after the Transfer Effective Date, subject to the applicable Medicare statute, regulations, policies, and procedures. Notwithstanding the foregoing, under no circumstances shall CMS adjust, offset, or recoup from any payments owing to DAP Health, or from any assets, on and after the Transfer Effective Date, or otherwise seek payment from DAP Health, for any liabilities related to periods before the Transfer Effective Date, including

123359760\V-1

liabilities related to goods or services provided by the Debtor, or otherwise pursuant to or connected with the Medicare Provider Agreements related to periods prior to the Transfer Effective Date.

15. Effective upon the Transfer Effective Date, all claims of the Debtor and DAP Health against CMS for any liability arising under the Medicare Provider Agreements for periods and goods or services provided before the Transfer Effective Date, whether known or unknown, shall be satisfied, discharged, and released, except as otherwise expressly provided herein. Notwithstanding the foregoing or any other term herein, the Parties agree that the Debtor shall continue to be eligible to submit claims and receive Medicare reimbursement for services provided during the Open Cost Reporting Periods and the Final Cost Report Period. CMS acknowledges and agrees that claims will be submitted by the Debtor in the ordinary course, in some cases on and after the Transfer Effective Date. CMS acknowledges that any such claims will not be considered a "liability" satisfied, discharged or released under this Agreement.

16. Effective upon the Transfer Effective Date, the claims of CMS against the Debtor or DAP Health for any claim or liability arising under the Medicare Provider Agreements on or before the Transfer Effective Date, whether known or unknown, liquidated, or contingent, shall be satisfied, discharged, and released, except as otherwise expressly provided herein, and CMS waives the right to future reimbursements, payments, claims, or overpayments relating thereto. CMS agrees that routine claims adjustments will be handled in the ordinary course of business. Notwithstanding the foregoing, CMS shall have the right to seek payment of subsequently discovered overpayments or amounts due the Medicare program for the Open Cost Reporting Periods preceding the Transfer Effective Date; provided, however, that all such rights will be exercised exclusively by way of recoupment against the Debtor's Medicare underpayments, and, only if exhausted, any claims

pending for services rendered by the Debtor prior to the Transfer Effective Date. Notwithstanding the preceding, however, in no event shall such claims adjustments, or subsequently discovered overpayments or amounts due to the Medicare program for the cost reporting period ending immediately prior to the Transfer Effective Date be recouped, withheld, or otherwise taken from amounts due to DAP Health or from any assets, or otherwise sought from or be the obligation of DAP Health.

17.    As of the Transfer Effective Date, the Debtor, DAP Health and CMS, will consider all cost reporting periods ending on or before the Transfer Effective Date ("Closed Cost Years") to be fully and finally closed in accordance with all applicable law, except as otherwise expressly provided for herein.

18.    CMS shall not file or otherwise assert against the Debtor, DAP Health or their estates or any other person or entity or any of their respective assets or property (real or personal) any lien ("Lien"), or alleged offset, setoff or recoupment claim or any other claim ("Offset Claim"), regardless of the statute or other legal authority upon which such Lien or Offset Claim may be asserted, related in any way to any remaining prepetition amounts allegedly owed to CMS by the Debtor arising from or related to the Medicare Provider Agreements or other arrangements entered into prior to the Transfer Effective Date, other than as expressly provided in this Agreement.

19.    Upon Court approval of this Agreement, CMS hereby waives any objections to the Sale and hereby acknowledges that it has no objections to the assignment of the Medicare Provider Agreements to DAP Health pursuant to the terms of the Sale, including as set forth in the respective Asset Purchase Agreement (the "APA"), which sets forth the terms for the Sale.

20.    Notwithstanding any other provision hereof, CMS shall be entitled to audit or reopen the Facilities or the Debtor's Medicare cost reports for the Closed Cost Years solely for the purpose of complying with any act of Congress requiring CMS to rely upon settled cost reports for the Closed Cost Years as a basis for adjusting Federal

123359760\V-1

payment rates to providers participating in Medicare. However, neither CMS, DAP Health, nor the Debtor shall use such adjustments to seek any further payments for the Closed Cost Years. CMS shall use such adjustments only to adjust payment rates to the Debtor or DAP Health for fiscal periods arising after the Closed Cost Years as part of adjustments in Federal payment rates applicable to all similarly situated providers participating in Medicare. Nothing in this paragraph shall waive or otherwise affect DAP Health's ability to appeal or otherwise challenge such adjustments and Federal payment rates on or after the Transfer Effective Date.

21. The Parties agree that for cost years beginning on or after the Transfer Effective Date, that, to the extent applicable, in accordance with and to the extent permitted under the Medicare statute, regulations, policies and procedures (including 42 C.F.R. § 489.18), successor liability attaches to any claim arising under the Medicare Provider Agreements and payments to DAP Health (or any future assignee under the provisions of Medicare law) and will be adjusted (in accordance with 42 U.S.C. § 1395g(a)) to account for prior overpayments and underpayments which arose, and are related to conduct, services rendered or claims or cost reports submitted for periods, on or after the Transfer Effective Date. Nothing in this Agreement waives or abrogates whatever rights, if any, CMS may have to recoup or offset against payments otherwise payable to DAP Health in connection with the Facilities, for periods on and after the Transfer Effective Date.

22. Upon the Transfer Effective Date, nothing in this Agreement as so ordered by the Court shall relieve or be construed to relieve DAP Health from complying with all procedures, rules and regulations of the Medicare program, including, but not limited to, (a) the requirement that they apply for and obtain HHS/CMS approval of a Change of Ownership by the filing of Form CMS 855 applications to the applicable Medicare Administrative Contractor, (b) the requirement that CMS review and adjust as appropriate future payments to be made

13

under the Medicare Provide Agreements for periods on and after the Transfer Effective Date, (c) the requirement that DAP Health file annual cost reports, starting with the cost year beginning on the Transfer Effective Date, and (d) CMS's right to alter or amend the method of reimbursement to DAP Health in accordance with applicable law. Furthermore, upon the Transfer Effective Date, DAP Health succeeds to the quality history of the Facilities and shall be treated, for purposes of survey and certification issues, as if it is the relevant owner and no change of ownership occurred.

23.     Nothing in this Agreement shall affect any obligations of CMS with respect to the processing of the assignment of the Medicare Provider Agreements, and CMS will process the assignment of the Medicare Provider Agreements in the ordinary course effective as of the Transfer Effective Date. However, as set forth in the CMS Program Integrity Manual at Chapter 10, Sections 10.2.1.4E and 10.6.22E, Medicare payments for all goods and services rendered both prior and subsequent to the Transfer Effective Date shall continue to be made to the Debtor, to the extent bills are submitted by or on behalf of the Debtor, while the assignment of the Medicare Provider Agreements and DAP Health's Change of Ownership applications are processed and until CMS approves the Change of Ownership applications and the assignment of the Medicare Provider Agreements. If requested by DAP Health, CMS agrees that from the Transfer Effective Date until the date that CMS approves the respective change of ownership submissions and the assignment of the Medicare Provider Agreements to DAP Health (and issues to DAP Health tie-in notices), payments are to be paid to the Debtor's lockbox accounts (which are already on file with Medicare), in the ordinary course.

24.     Each Party hereto agrees that it fully participated in the drafting of this Agreement. The rule of law which provides that ambiguities will be construed against the drafting party in interpreting written instruments shall not be applicable to or used

123359760\V-1

in resolving any dispute over the meaning or intent of this Agreement or any of its provisions.

25. This Agreement is the full and complete agreement of the Parties, and this Agreement may not be modified or altered in any manner, except by written agreement of all the undersigned Parties hereto. The provisions of this Agreement supersede any prior understandings or agreements of the Parties.

26. This Agreement is binding upon the undersigned Parties, their successors, and assigns. Only the undersigned Parties may enforce this Agreement, and this Agreement creates no rights in any third parties other than DAP Health. The Parties acknowledge that DAP Health is intended to be, and is, a third-party beneficiary of this Agreement.

27. Any disputes regarding the rights, claims, defenses, obligations of the Parties to this Agreement hereunder shall be governed by federal law. The Bankruptcy Court has jurisdiction over any dispute arising from or relating to this Agreement.

28. Notwithstanding anything herein, this Agreement does not affect the rights, claims, and defenses of any Federal Agency other than CMS and its pending objection to the Debtor's proposed treatment of the Medicare Provider Agreements in the sale to DAP Health; its ability to recoup any overpayments made pursuant to the Medicare Provider Agreements currently in effect between CMS and the Debtor prior to the Transfer Effective Date; and the claim CMS filed in this bankruptcy (Proof of Claim No. 217). This Agreement is not intended to, and does not, constitute a release, waiver, or compromise of any claims against either the Debtor or DAP Health under the False Claims Act or otherwise within the authority of the United States Attorney's Offices or the Civil Frauds Section of the Commercial Litigation Branch of the United States Department of Justice, nor of any other civil, criminal, fraud, or tax claims.

29. The Parties executing this Agreement do so without admitting any fault or liability whatsoever. No term or condition of this Agreement is intended to be or shall be deemed or construed as an expression of fault or liability.

30. This Agreement, or any provision hereof, may not be waived, amended, or revoked, or the ongoing obligations of any Party terminated, except by a further writing signed by all such Parties and DAP Health.

31. This Agreement is the product of negotiation by and among the Parties, executed voluntarily and without duress or undue influence on the part of or on behalf of any Party hereto. Each of the Parties acknowledges that it has had the opportunity to be represented by its own independent counsel in connection with this Agreement and the transactions contemplated by or referred to in this Agreement. Hence, in any construction to be made of this thereof, the same shall not be construed against any Party.

32. The failure or delay on the part of any Party to enforce or exercise at any time any of the provisions, rights or remedies in this Agreement shall in no way be construed to be a waiver thereof, nor in any way to affect the validity of this Agreement or any part hereof, or the right of such Party to thereafter enforce each and every such provision, right or remedy. No waiver of any breach of this Agreement shall be held to be a waiver of any other or subsequent breach. No other Party, nor any agent nor any attorney of any other Party has made any promise, representation or warranty whatsoever, express or implied, not contained herein or therein concerning the subject matter hereof to induce said Party to execute or authorize the execution of this Agreement, and each of the Parties hereto further acknowledges that said Party has not executed or authorized the execution of this Agreement in reliance upon any such promise, representation or warranty not contained herein or therein.

33. Each Party shall pay its own attorneys' fees, costs and expenses in connection with the preparation, negotiation and execution of this Agreement.

123359760\V-1

34. Subject to obtaining approval from the Bankruptcy Court, each Party hereto hereby represents and warrants to the other Parties that the undersigned representative of such Party has authority to execute this Agreement and to bind such Party to the terms hereof.

35. This Agreement may be executed in counterparts, which shall be considered as a single document. Furthermore, this Agreement may be executed by facsimile copy or other electronic means, and facsimile or other electronic signatures will be treated as original signatures.

IN WITNESS WHEREOF, each of the Parties has caused this Agreement to be executed and delivered as of June 23, 2023.

DATED: June 5, 2023

DENTONS US LLP
SAMUEL R. MAIZEL
TANIA M. MOYRON

By: *[signature: S. R. Maizel]*
SAMUEL R. MAIZEL

*Counsel for*
*Borrego Community Health Foundation*

DATED: June 23, 2023

RANDY S. GROSSMAN
United States Attorney

By: *[signature: Leslie M. Gardner]*
LESLIE M. GARDNER

*Counsel for Creditor U.S. Department of*
*Health and Human Services*

17